**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

JEFFREY SOFFER, et al.,

        Plaintiff(s),

v.

FIVE MILE CAPITAL PARTNERS, LLC, et al.,

        Defendant(s).

2:12-CV-1407 JCM (GWF)

**ORDER**

Presently before the court is defendants Five Mile Capital Partners, LLC ("FMC LLC"); Five Mile Capital II Pooling International, LLC ("FMC II Pooling"); Five Mile Capital II Town Square SPE, LLC ("FMC II Town Square"); James G. Glasgow, Jr. ("Glasgow"); and David J. Lattimer's ("Lattimer"), (collectively "defendants") motion to dismiss. (Doc. # 27).[1] Plaintiffs Jacquelyn and Jeffery Soffer (the "Soffers"); and limited liability companies controlled by the Soffers, Turnberry Capital, LLC ("TBC"); J&JS Town Square, LLC ("J&JS"); and Turnberry Town Square, LLC ("TBTS"), (collectively, "plaintiffs") filed a response. (Doc. # 38).[2] Defendants replied. (Doc. # 42).

**I.  Background**

This dispute arises out of a potential joint venture real estate relationship that soured

---

[1] Defendants also filed a request for judicial notice (doc. # 29), a declaration of David Fleischer (doc. # 28), and an appendix of exhibits (doc. # 30).

[2] Plaintiffs also filed a declaration of Christopher J. Major and supporting exhibits. (Doc. # 39).

**James C. Mahan**
**U.S. District Judge**

1  in 2010. Plaintiffs allege that defendants FMC LLC, FMC II Pooling, FMC II Town Square,
2  (collectively, "FMC") a hedge fund in Connecticut; as well as Glasgow and Lattimer (collectively
3  "FMC managers") (1) interfered with contractual relations and/or prospective economic advantage,
4  (2) committed fraud, and (3) breached their fiduciary duties.

5  Town Square is a mixed-use space that was developed by the Soffers and operated by the
6  Soffers and their affiliates until March 2011. Town Square was financed by two loans obtained in
7  2006. The first loan, obtained by Turnberry/Centra Sub, LLC ("Turnberry Sub"), was a $470 million
8  construction loan from a syndicate of fifteen lenders (the "Senior Lenders"). The loan was made
9  pursuant to a construction loan agreement between Turnberry Sub and Deutsche Bank Trust
10 Company Americas ("Deutsche Bank"), as an administrative agent for the Senior Lenders.
11 Repayment of the construction loan was secured by a deed of trust that granted the Senior Lenders
12 a mortgage lien on Town Square and a $40 million payment guaranty issued by the Soffers.

13 The second loan, Turnberry/Centra Quad, LLC ("Turnberry Quad"), was a $50 million
14 mezzanine loan. The loan was made pursuant to a mezzanine loan and security agreement between
15 Turnberry Quad and Deutsche Bank, as initial lender and administrative agent for the Senior
16 Lenders. As part of an agreement between Turnberry Quad and Deutsche Bank, upon default under
17 the mezzanine loan agreement, the lender could sell at a public or private sale Turnberry Quad's
18 ownership interest in Turnberry Sub. This would displace the Soffers and their affiliates as the
19 ultimate owner of Town Square. In 2007, FMC II Pooling purchased a $20 million participation
20 interest in the mezzanine loan. Together, Deutsche Bank and FMC II Pooling became the
21 "mezzanine lenders."

22 In December 2008, in anticipation of being unable to repay the construction loan and the
23 mezzanine loan (collectively, the "loans"), the Soffers and Turnberry Sub entered into pre-
24 negotiation agreements with Deutsche Bank, as agent for the Senior Lenders (the "construction loan
25 PNA" and the "mezzanine loan PNA"; collectively, the "PNAs"). Under the PNAs, the parties
26 sought to restructure a new loan. In November 2009, the mezzanine loan PNA was amended to
27 include FMC II Pooling and its affiliates as "negotiating parties."

28

**James C. Mahan**
**U.S. District Judge**

In March 2009, the Soffers commenced negotiation with the Senior Lenders to restructure the loans. The parties planned a "friendly foreclosure" to facilitate a global restructuring of the construction loan which would wipe out the mezzanine loan. The Soffers, not wanting the mezzanine lenders to be wiped out, reached out to Glasgow in the summer of 2009. The Soffers proposed a joint venture whereby the Soffers, TBC, and FMC would form a new borrower to take the new loan from the Senior Lenders in exchange for retiring the mezzanine loan. Plaintiffs allege that the FMC managers feigned interest in the joint venture in order to steal Town Square from the Soffers.

In November 2009, FMC LLC and FMC II Town Square entered into a written limited liability company agreement (the "joint venture agreement") with TBC. The signature pages were held in escrow until the new loan was complete. Plaintiff alleges that FMC utilized the PNA and disclaimer language in the exchange of the joint venture agreement as part of FMC's scheme to lull the Soffers into believing that they were partners with FMC when in reality FMC intended on blocking the new loan.

In December 2009, the Bank of Nova Scotia ("BNS") which succeeded the Deutsche Bank as administrative agent for the Senior Lenders, nearly reached a final deal for the new loan, identifying  material terms and parties to the contract.

In August 2010, plaintiffs allege that defendants began their plan to block the closing of the new loan. In September 2010, plaintiffs allege that defendant made false claims to the Senior Lenders regarding the Soffers' management of Town Square. In October 2010, plaintiffs allege that defendants stopped communicating with the Soffers.

In February 2011, defendants, along with other hedge funds, purchased a significant portion of the senior debt from the Senior Lenders. Collectively, these hedge funds gained control of the Senior Lenders and blocked the restructuring with the Soffers. In March, 2011, FMC II Pooling brought Town Center at a non-judicial foreclosure for $276,500,000.

Plaintiffs allege that this was all part of defendants' plan. To lull the Soffers into believing that they were partners with defendants in order to stop the senior lenders from consensually foreclosing and wiping out the mezzanine loan.

James C. Mahan
U.S. District Judge

- 3 -

## II. Legal standards

### A. Rule 12(b)(6)

A court may dismiss a plaintiff's complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A properly pled complaint must provide "[a] short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). While Rule 8 does not require detailed factual allegations, it demands "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (citation omitted).

"Factual allegations must be enough to rise above the speculative level." *Twombly*, 550 U.S. at 555. Thus, to survive a motion to dismiss, a complaint must contain sufficient factual matter to "state a claim to relief that is plausible on its face." *Iqbal*, 129 S.Ct. at 1949 (citation omitted).

In *Iqbal*, the Supreme Court clarified the two-step approach district courts are to apply when considering motions to dismiss. First, the court must accept as true all well-pled factual allegations in the complaint; however, legal conclusions are not entitled to the assumption of truth. Id. at 1950. Mere recitals of the elements of a cause of action, supported only by conclusory statements, do not suffice. *Id.* at 1949.

Second, the court must consider whether the factual allegations in the complaint allege a plausible claim for relief. *Id.* at 1950. A claim is facially plausible when the plaintiff's complaint alleges facts that allows the court to draw a reasonable inference that the defendant is liable for the alleged misconduct. *Id.* at 1949.

Where the complaint does not permit the court to infer more than the mere possibility of misconduct, the complaint has "alleged – but not shown – that the pleader is entitled to relief." *Id.* (internal quotations omitted). When the allegations in a complaint have not crossed the line from conceivable to plausible, plaintiff's claim must be dismissed. *Twombly*, 550 U.S. at 570.

The Ninth Circuit addressed post-*Iqbal* pleading standards in *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). The *Starr* court stated, "First, to be entitled to the presumption of truth, allegations in a complaint or counterclaim may not simply recite the elements of a cause of action,

1  but must contain sufficient allegations of underlying facts to give fair notice and to enable the
2  opposing party to defend itself effectively. Second, the factual allegations that are taken as true must
3  plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to
4  be subjected to the expense of discovery and continued litigation." *Id.*

     **B.**    **Rule 9**

6       Rule 9 provides that for a party to allege fraud, he "must state with particularity the
7  circumstances constituting fraud . . . . Malice, intent, knowledge, and other conditions of a person's
8  mind may be alleged generally." FED. R. CIV. P. 9(b). Assertions of fraud must include "the who,
9  what, when, where, and how" of the misconduct alleged. *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d
10 1097, 1106 (9th Cir. 2003). Rule 9 serves several purposes, including: (1) providing defendants with
11 adequate notice so they are able to defend the charge and deter plaintiffs from filing complaints "'as
12 a pretext for the discovery of unknown wrongs'; (2) to protect those whose reputation would be
13 harmed as a result of being subject to fraud charges; and (3) to 'prohibit [ ] plaintiff[s] from
14 unilaterally imposing upon the court, the parties and society enormous social and economic costs
15 absent some factual basis.'" *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009)
16 (quoting *In re Stac Elecs. Sec Litig.*, 89 F.3d 1399, 1405 (9th Cir. 1996) (citation omitted)).

**III.**    **Incorporated by reference into amended complaint & judicial notice**

18      Review on a motion pursuant to Fed.R.Civ.P. 12(b)(6) is normally limited to the complaint
19 itself. *See Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001). If the district court relies
20 on materials outside the pleadings in making its ruling, it must treat the motion to dismiss as one for
21 summary judgment and give the non-moving party an opportunity to respond. Fed.R.Civ.P. 12(b);
22 *see United States v. Ritchie,* 342 F.3d 903, 907 (9th Cir.2003). "A court may, however, consider
23 certain materials—documents attached to the complaint, documents incorporated by reference in the
24 complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for
25 summary judgment." *Ritchie,* 342 F.3d at 908.

26 . . .

27 . . .

28

**James C. Mahan**
**U.S. District Judge**

A court may also treat certain documents as incorporated by reference into the plaintiff's complaint if the complaint "refers extensively to the document or the document forms the basis of the plaintiff's claim." *Id.* at 908. If adjudicative facts or matters of public record meet the requirements of Fed. R. Evid. 201, a court may judicially notice them in deciding a motion to dismiss. *Id.* at 909; *see* FED.R.EVID. 201(b) ("A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."); *see also Carstarphen v. Milsner*, 594 F. Supp. 2d 1201, 1207 (D. Nev. 2009).

"Court orders and filings are the type of documents that are properly noticed under [Rule 201(b) ]." *Neilson v. Union Bank of Cal.*, 290 F.Supp.2d 1101, 1112 (C.D. Cal. 2003). In particular, courts may take judicial notice of proceedings of other courts if those proceedings have a "direct relation to matters at issue." *United States ex rel. Robinson Rancheria Citizens Council v. Borneo*, 971 F.2d 244, 248 (9th Cir. 1992) (citations omitted). Nonetheless, the court can only take judicial notice of these documents for the "limited purpose of recognizing the 'judicial act' that the order represents on the subject matter of litigation." *Neilson*, 290 F.Supp.2d at 1112 (quoting *United States v. Jones*, 29 F.3d 1549, 1553 (11th Cir. 1994)).

Defendants have submitted a declaration of David Fleischer, a request for judicial notice, and an appendix of exhibits in support of their motion to dismiss. (Docs. # 28, 29, & 30).

Defendants provide several documents (exhibits 1–10) on the basis that these documents are incorporated by reference in the amended complaint. (Doc. # 30). To the extent that these documents are referenced in the complaint, the court will consider these documents. Further, defendants request the court take judicial notice of exhibits 11–17. (Docs . # 39 & 30). Given that these documents are a matter of public record, the court takes judicial notice. *See Intri-Plex Technology, Inc. v. Crest Group, Inc.*, 499 F.3d 1048, 1052 (9th Cir. 2007) ("A court may take judicial notice of matters of public record without converting a motion to dismiss into a motion for summary judgment as long as the facts are not subject to reasonable dispute.")

James C. Mahan
U.S. District Judge

- 6 -

However, the court notes that it takes judicial notice of the existence of these documents and not for the truth of any disputed facts therein. *See San Luis v. Badgley*, 136 F.Supp.2d 1136, 1146 (E.D.Cal. 2000) (a court "may take judicial notice of a document filed in another court not for the truth of the matters asserted in the litigation, but rather to establish the fact of such litigation and related filings" (citation omitted)); *see also Miglin v. Mellon*, 2:08-CV-01013-LRH-PA, 2009 WL 3719457, at *2 (D. Nev. Nov. 4, 2009) (taking judicial notice of documents for their existence and not for the truth of any disputed fact therein).

Plaintiffs have submitted a declaration of Christopher J. Major and four documents (exhibits 1–4) that relate to *Turnberry/Centra Sub, LLC v. Ballard Spahr, LLP, et al.*, case no. A-11-635777-C ("*Soffer v. BNS*"). (Doc. # 39).[3] Exhibit 1 is a transcript of the hearing on the parties' cross motions for summary judgment, while exhibits 2–4 are email chains produced in discovery in that action. The court finds that exhibit one is subject to judicial notice. However, the court does not find the rest of these documents to be subject to judicial notice. However, the court will consider these exhibits to the extent that they are referenced in the complaint.

### IV. Discussion[4]

#### A. Tortious interference with contract and/or prospective economic advantage

##### i. Tortious interference with contract

To prove intentional interference with contractual relations, "a plaintiff must establish: (1) a valid and existing contract; (2) the defendant's knowledge of the contract; (3) intentional acts intended or designed to disrupt the contractual relationship; (4) actual disruption of the contract; and (5) resulting damage." *J.J. Indus., LLC v. Bennett*, 119 Nev. 269, 273, 71 P.3d 1264, 1267 (2003). To prove an intentional interference, "the plaintiff must establish that the defendant had a motive to induce breach of the contract with the third party." *Id.* at 1268.

---

[3] *Soffer v. BNS* is a state court case related to this matter.

[4] Choice of law: plaintiffs argue, and defendants concede, that there does not appear to be a conflict between the law of New York and Nevada on the causes of action brought in plaintiff's amended complaint. On that basis, the court need not decide whether New York or Nevada law applies to plaintiff's tort claims at this juncture. While the court applies Nevada law to address the instant motion, the choice of law issue is preserved.

James C. Mahan
U.S. District Judge

- 7 -

Defendants argue that plaintiffs' tortious interference with contract fails under the first element–that is, to establish the existence of a valid existing contract. Defendants contend that plaintiffs are collaterally estopped from arguing that a binding contract was formed between the Soffers and the Senior Lenders during the restructuring negotiations by *Soffer v. BNS*. Plaintiffs appear to concede that they cannot show that there is an existence of a valid enforceable contract between plaintiffs and the Senior Lenders based on the state court's determination. Despite this concession, the court, in good faith, determines whether plaintiffs' claim is collaterally estopped.

"Issue preclusion, or collateral estoppel, may be implicated when one or more of the parties to an earlier suit are involved in subsequent litigation on a different claim." *Univ. of Nevada v. Tarkanian*, 879 P.2d 1180, 1191 (Nev. 1994). "The doctrine of issue preclusion prevents relitigation of all issues of fact or law that were actually litigated and necessarily decided in a prior proceeding." *Robi v. Five Platters, Inc.*, 838 F.2d 318, 322 (9th Cir. 1988) (internal citations and quotations omitted).

"In both the offensive and defensive use situations the party against whom estoppel [issue preclusion] is asserted has litigated and lost in an earlier action." *Id.* (alteration in original) (internal quotations and citations omitted). "The issue must have been actually decided after a full and fair opportunity for litigation." *Id.*

"Under the Full Faith and Credit Act, federal courts must give state judicial proceedings the same full faith and credit as they have by law or usage in the courts of the State from which they are taken." *Id.* (quoting 28 U.S.C. § 1738); *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984) ("Section 1738 requires federal courts to give the same preclusive effect to state court judgments that those judgments would be given in the courts of the State from which the judgments emerged.").

Under Nevada law, "the following factors are necessary for application of issue preclusion: (1) the issue decided in the prior litigation must be identical to the issue presented in the current action; (2) the initial ruling must have been on the merits and have become final; (3) the party against

James C. Mahan
U.S. District Judge

- 8 -

whom the judgment is asserted must have been a party or in privity with a party to the prior litigation; and (4) the issue was actually and necessarily litigated." *Five Star Capital Corp. v. Ruby*, 194 P.3d 709, 713 (Nev. 2008).

First, the plaintiffs in *Soffer v. BNS* argued the same issue presented here–that the restructuring negotiations with the Senior Lenders resulted in a binding contract. And the court in *Soffer v. BNS* held that an enforceable contract had not been formed. (*See* docs. # 28, # 30, Ex. 17, ¶ 6). Second, the *Soffer v. BNS* order was a final ruling on the merits, as it granted a motion for summary judgment disposing of the entire action. *See Brennan v. EMDE Med. Research*, Inc., 652 F. Supp. 255, 261 (D. Nev. 1986). Although plaintiffs appealed the state court action, the judgment maintains its preclusive effect while on appeal. *Edwards v. Ghandour*, 123 Nev. 105, 117, 159 P.3d 1086, 1094 (2007), *modified on other grounds by Five Star Capital Corp. v. Ruby*, 124 Nev. 1048, 194 P.3d 709 (2008).

Third, the *Soffer v. BNS* action involved the same plaintiffs or their privies in interest. The plaintiffs in *Soffer v. BNS* were Jeffery Soffer and TBC, both of which are plaintiffs to this action. The additional plaintiffs in this case–Jacquelyn Soffer, J&JS, and TBTS–are bound by the judgment against Jeffrey Soffer and TBC because they were "adequately represented by [him]," *Taylor v. Sturgell*, 553 U.S. 880, 894 (2008) (citation omitted), because of his shared interest in arguing that a binding contract was formed with the Senior Lenders. Jeffery Soffer and TBC "may not avoid [the] preclusive force" of the prior judgment "by relitigating through a proxy," *id.* at 895, through Jacquelyn Soffer or their affiliates. Fourth, the issue of whether there is a binding contract between the Soffers and the Senior Lenders was "actually and necessarily litigated" in the state court action. *Five Star Capital*, 194 P.3d at 713. This issue was squarely before the court in *Soffer v. BNS* and the court decided the issue on the merits.

Plaintiffs are collaterally estopped from asserting that defendants tortiously caused the Senior Lenders to breach a binding contract because, as determined by the state court in *Soffer v. BNS*, there is no valid existing contract that defendants could have interfered with. This cause of action is dismissed without prejudice.

James C. Mahan
U.S. District Judge

- 9 -

Plaintiffs may move for leave to reinstate this cause of action if the Nevada Supreme Court reverses and finds the new loan to be a binding contract. *See, e.g.*, *Austin v. Life Partners, Inc.*, 2:11-CV-01767-PMP, 2012 WL 5334649, at *3 (D. Nev. Oct. 26, 2012) (dismissing without prejudice subject to renewal based on the outcome of later developments).

### ii. Tortious interference with prospective contractual relationship

To prove intentional interference with prospective contractual relationship, a plaintiff must establish: "(1) a prospective contractual relationship between the plaintiff and a third party; (2) knowledge by the defendant of the prospective relationship; (3) intent to harm the plaintiff by preventing the relationship; (4) the absence of privilege or justification by the defendant; and (5) actual harm to the plaintiff as a result of the defendant's conduct." *Wichinsky v. Mosa*, 109 Nev. 84, 85-88, 847 P.2d 727, 729-30 (1993).

Plaintiffs have sufficiently stated a cause of action for tortious interference with prospective contractual relationship.

#### (1) prospective contractual relationship

Defendants argue that plaintiff's allegation of a prospective contract is too speculative because the state court action found the new loan was non-binding. But this finding by the state court is preclusive only to the extent that plaintiffs seeks to bring a cause of action for tortious interference with contract–that cause of action is not at issue here.

While the construction loan PNA provided the Senior Lenders protection during negotiations of the new loan, this contractual safeguard does not, in it of itself, discount the prospect of a contractual relationship. Plaintiffs' amended complaint cites to a particular potential contract with specific terms between identified parties, this is adequate to show a prospective contractual relationship at the motion to dismiss stage. *See e.g.*, *Boart Longyear, Inc. v. Nat'l EWP, Inc.*, 2:11-CV-2106 JCM RJJ, 2012 WL 1985293, at *9 (D. Nev. June 4, 2012) (finding that plaintiff's complaint contained sufficient factual matter to state a claim for tortious interference with prospective advantage although plaintiff's allegations did not include specific contracts or dates).

. . .

>    *(2)   knowledge by the defendant of the prospective relationship & (3) intent to harm the plaintiff*

Defendants do not appear to argue that plaintiffs failed to allege these elements. The amended complaint clearly alleges that defendants knew about the new loan and engaged in conduct designed to interfere with the new loan. Thus, these elements have been met.

>    *(4)   absence of privilege or justification*

Looking at the face of the complaint, plaintiffs have alleged sufficient factual matter to demonstrate the defendants used improper means to interfere with plaintiff's prospective contractual relationship. *See Las Vegas-Tonopah-Reno Stage Line, Inc. v. Gray Line Tours of S. Nevada*, 106 Nev. 283, 792 P.2d 386 (1990) (defendant uses improper means when it acts in a tortious, criminal, or unscrupulous manner to achieve the interference).

To the extent that defendants argue that plaintiffs' own allegations admit that defendants acted–at least in part–to protect their prexisting $20 million investment in the mezzanine loan, *see Leavitt v. Leisure Sports Incorporation*, 103 Nev. 81, 88, 734 P.2d 1221, 1226 (1987) (recognizing, with respect to a claim for tortious interference with economic advantage, that defendant is privileged to act "to protect his own interests"); the court finds that plaintiffs have alleged sufficient factual matter that the parties were in the process of forming a partnership and that defendants used improper means for the court to draw a reasonable inference that defendants are liable for the alleged misconduct. *Iqbal*, 129 S.Ct. at 1949.[5]

. . .

. . .

. . .

---

[5] Defendants have not cited, and the court has not found, any Nevada cases requiring plaintiffs to allege that defendants were motivated *solely* by malice or an intention to cause harm, *see Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 818 N.E.2d 1100 (2004). On this basis, the court finds that there is a conflict of law on this issue; the court applies the law of the forum state and where the injury occurred, which are both considerations in choice of law analysis. *See Gen. Motors Corp. v. Eighth Judicial Dist. Court of State of Nev. ex rel. County of Clark*, 122 Nev. 466, 473, 134 P.3d 111, 116 (2006).

**James C. Mahan**
**U.S. District Judge**

- 11 -

       (5)    actual harm

Defendants argue that plaintiffs have not alleged that they were harmed by defendants' conduct. Defendants point to portions of the complaint that identify conduct of defendants that either occurred after the contract was in the process of formation or that was disregarded by BNS in its decision to continue negotiating with the Soffers.

While there are allegations regarding defendants' allegedly unsuccessful attempts to derail negotiations with the Soffers, plaintiffs have sufficiently alleged actual harm to plaintiffs, totaling at least $300 million in damages. (*See* doc. # 8, ¶ 107).

Accordingly, defendant's motion to dismiss plaintiff's claim for tortious interference with prospective contractual relationship is denied.

**B.    Fraud**

Claims for fraud in the inducement and fraud in the execution have four elements: (1) a misrepresentation of material fact; (2) knowledge of the falsity of the representation by the defendant; (3) an intention on part of the defendant to induce reliance by the plaintiff; (4) plaintiff's justifiable reliance upon the misrepresentation; and (5) an injury suffered by the plaintiff as a result from such reliance. *See J.A. Jones Const. Co. v. Lehrer McGovern Bovis, Inc.*, 120 Nev. 277, 290, 89 P.3d 1009, 1018 (2004).[6]

The amended complaint adequately pleads a knowing misrepresentation of fact by defendants that they intended plaintiffs to reply upon. That is, in early 2009, defendants falsely represented to the Soffers that they wished to form a partnership in order to obtain valuable information about Town Square. (*See* doc. # 8, ¶¶ 29, 35, 36-37, 39-40). Plaintiffs specifically allege the time, place, and content of the fraud. *See Seneca Ridge Mgmt., LLC v. Children's Choice Learning Centers, Inc.*, 2:12-CV-491 JCM CWH, 2012 WL 3061494, at *3 (D. Nev. July 26, 2012) (allegations that fraud occurred between January and March 2006, in the prospectus furnished to plaintiff, and was based on an overstated expansion plan was sufficient to state a fraud claim).

---

[6] The court notes that it does not appear that plaintiffs' amended complaint alleges fraud in the inducement, but simply fraud. However, because both parties' argument appear to center around fraudulent inducement, the court considers this cause of action.

James C. Mahan
U.S. District Judge

- 12 -

1    Plaintiffs also allege that they justifiably relied on the misrepresentations and were injured
2 as a result of this reliance. Plaintiffs allege that they were induced into singing the PNA with
3 defendants and on the basis of this reliance, were harmed by losing Town Square and being sued by
4 the Senior Lenders for the $40 million guaranty. (*See* doc. # 8, ¶¶ 100, 114).

          **i.     Mezzanine loan PNA**

6    Defendant argues that plaintiffs' fraud claim fails because it impermissibly seeks to evade
7 the protections of the mezzanine loan PNA. Defendants point to § 1 of the mezzanine PNA loan
8 which provides that any party to the agreement "may terminate the discussions and/or negotiations
9 at any time, with or without notice, in its sole discretion and with or without cause, without incurring
10 any liability whatsoever on account of such termination." (Docs. # 28, # 30, Ex. 8, § 1). Defendants
11 also argue that plaintiffs have not alleged that these misrepresentations caused any damage because
12 any proposal that plaintiff's forwent was foreclosed by § 8 of the mezzanine PNA loan which
13 provides that the Soffers "should not pass up any alternative opportunities."   (*Id.*, § 8). Last,
14 defendants rely on § 6of the PNA loan which disclaims the existence of "any fiduciary or special
15 relationship with any party" to the agreement." (*Id.*, § 9).

16    Plaintiffs attempt to rely on parol evidence to establish that they were fraudulently induced
17 into signing the PNA and thus the provisions of the PNA cannot serve as the basis for dismissal.
18 Plaintiff relies on *Sierra Diesel Injection Serv. v. Burroughs Corp., Inc.*, for the proposition that
19 "Nevada case law holds that the parol evidence rule may not operate to exclude evidence of fraud
20 in the inducement of contract, even where the court finds an integrated agreement." 651 F. Supp.
21 1371, 1377 (D. Nev. 1987) (citation omitted).

22    However, a fraudulent inducement claim fails as a matter of law where it directly contradicts
23 the terms of an express written contract. *See Road & Highway Builders v. N. Nev. Rebar*, 284 P.3d
24 377, 381 (Nev. 2012). Because the alleged false promise to become partners is covered by the PNA
25 itself, the parol evidence would contradict the terms of the agreement , "in direct contravention of
26 the rules." *See id.* (*citing Green v. Del–Camp Investment, Inc.*, 14 Cal.Rptr. 420, 422 (1961)).
27 . . .
28

**James C. Mahan**
**U.S. District Judge**

- 13 -

While plaintiffs' complaint sufficiently pleads the required elements of fraudulent inducement; the court finds that these allegations conflict with the express terms of the PNA.[7] "[T]he purported inducement cannot be something that conflicts with the [PNA's] express terms, as the terms of the contract are the embodiment of *all* oral negotiations and stipulations." *Road & Highway Builders*, 284 P.3d at 381 (emphasis in original) (citation omitted).

On this basis, plaintiffs' fraudulent inducement claim is dismissed.[8]

### ii. Duty to disclose omitted facts

"For a mere omission to constitute actionable fraud, a plaintiff must first demonstrate that the defendant had a duty to disclose the fact at issue." *Dow Chem. Co. v. Mahlum*, 114 Nev. 1468, 1486, 970 P.2d 98, 110 (1998), *abrogated on other grounds by GES, Inc., v. Corbitt*, 117 Nev. 265, 21 P.3d 11 (2001). "A fiduciary relationship, for instance, gives rise to a duty of disclosure." *Id.* (*citing Foley v. Morse & Mowbray*, 109 Nev. 116, 125–26, 848 P.2d 519, 525 (1993)).

Defendants argue that there was never a time when defendants owed plaintiffs a duty to disclose because defendants were never in a fiduciary or special relationship with plaintiffs. Defendants rely on § 6 of the PNA loan which disclaims the existence of "any fiduciary or special relationship with any party" to the agreement." (Docs. # 28, # 30, Ex. 8, § 6).

Plaintiff asserts that courts have recognized that putative joint venture partners owe duties of good faith and loyalty even before the joint venture is formed. Specifically, plaintiffs argue that even though the parties' signatures to the LLC agreement that would have governed their joint venture were held in escrow and never delivered, that does not prevent a fiduciary duty claim.

Because the mezzanine's PNA disclaimer language is clear and unambiguous that no "special relationship" existed between defendants and plaintiffs, the court finds that defendants did not have a duty to disclose. Further, plaintiffs have cited no Nevada case law, and the court is not aware of any, that recognizes a fiduciary relationship between putative joint venture partners. Here,

---

[7] The court finds that the mezzanine PNA loan "forms the basis of the plaintiff's claim," *Ritchie,* 342 F.3d at 908; and thus is appropriate to consider at the motion to dismiss stage.

[8] It does not appear that plaintiffs sought recession of the PNA in the amended complaint although plaintiffs' argue that they have a viable claim for such relief.

enforcement of the disclaimer language in §6 of the PNA immunizes defendants from liability for any wrongdoing rooted in obligations of a fiduciary.

On this basis, plaintiffs' fraud claim for failure to disclose is dismissed.

### C. Fiduciary duty

Plaintiffs' final cause of action is for breach of fiduciary duty. However, this cause of action is closely tied to plaintiffs' cause of action for fraud based on failure to disclose. The court finds that discussion, *supra* V.B.ii., sufficient to address the infirmities of this cause of action. Thus, this plaintiffs' fiduciary duty claim is likewise dismissed.

## VI. Leave to amend

In their opposition to defendants' motion to dismiss, plaintiffs requested leave to amend. The court reminds plaintiffs that if they choose to amend their complaint, they must comply with the requirements of local rule 15-1 and file a motion to amend, attaching the proposed amended complaint. Additionally, if the amended complaint is similarly deficient, the court may conclude that further leave to amend would be futile.

## VII. Conclusion

Accordingly,

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that defendants FMC LLC, FMC II Pooling, FMC II Town Square, Glasgow, and Lattimer's motion to dismiss (doc. # 27) be, and the same hereby is, GRANTED in part and DENIED in part consistent with the foregoing.

IT IS FURTHER ORDERED that plaintiffs, if they chooses to amend their complaint, file the motion to amend, attaching the proposed amended complaint, within thirty (30) days of the date of this order.

DATED February 19, 2013.

*James C. Mahan*
UNITED STATES DISTRICT JUDGE

James C. Mahan
U.S. District Judge

- 15 -