1
2
3
4
5

**UNITED STATES DISTRICT COURT**

6

**DISTRICT OF NEVADA**

7

8    JEFFREY SOFFER, et al.,                     2:12-CV-1407 JCM (GWF)

9                    Plaintiff(s),

10   v.

11   FIVE MILE CAPITAL PARTNERS,
12   LLC, et al.,

13                    Defendant(s).

14

15                              **ORDER**

16         Presently before the court is defendants Five Mile Capital Partners, LLC ("FMC LLC"); Five

17   Mile Capital II Pooling International, LLC ("FMC II Pooling"); Five Mile Capital II Town Square

18   SPE, LLC ("FMC II Town Square"); James G. Glasgow, Jr. ("Glasgow"); and David J. Lattimer's

19   ("Lattimer") (collectively, "defendants") motion to reconsider a judgment under FRCP 59(e). (Doc.

20   #47). Plaintiffs Jacquelyn and Jeffery Soffer (the "Soffers") and limited liability companies

21   controlled by the Soffers: Turnberry Capital, LLC ("TBC"); J&JS Town Square, LLC ("J&JS"); and

22   Turnberry Town Square, LLC ("TBTS") (collectively, "plaintiffs") filed a response (Doc. #48) and

23   defendants filed a reply. (Doc. #50).

24   **I.      Background**

25         This dispute arises out of a potential joint venture real estate relationship that soured in 2010.

26   Defendants FMC LLC, FMC II Pooling, and FMC II Town Square (collectively "FMC") together

27   constitute a Connecticut hedge fund. Defendants Glasgow and Lattimer (collectively "FMC

28

**James C. Mahan**
**U.S. District Judge**

1    managers") are managers of that fund. Plaintiffs' complaint alleges that all defendants (1) interfered
2    with contractual relations and/or prospective economic advantage, (2) committed fraud, and (3)
3    breached their fiduciary duties.

4    　　Town Square is a mixed-use space that was developed by the Soffers and operated by the
5    Soffers until March 2011. Town Square was financed by two loans obtained in 2006. The first loan,
6    obtained by Turnberry/Centra Sub, LLC ("Turnberry Sub"), was a $470 million construction loan
7    from a syndicate of fifteen lenders (the "Senior Lenders"). The loan was made pursuant to a
8    construction loan agreement between Turnberry Sub and Deutsche Bank Trust Company Americas
9    ("Deutsche Bank"), as an administrative agent for the Senior Lenders. Repayment was secured by
10   a deed of trust that granted the Senior Lenders a mortgage lien on Town Square and a $40 million
11   payment guaranty issued by the Soffers.

12   　　The second loan, Turnberry/Centra Quad, LLC ("Turnberry Quad"), was a $50 million
13   mezzanine loan. The loan was made pursuant to a mezzanine loan and security agreement between
14   Turnberry Quad and Deutsche Bank, as initial lender and administrative agent for the Senior
15   Lenders. In 2007, FMC II Pooling purchased a $20 million participation interest in the mezzanine
16   loan. Together, Deutsche Bank and FMC II Pooling became the "mezzanine lenders".

17   　　In December 2008, in anticipation of being unable to repay the construction loan and the
18   mezzanine loan (collectively, the "loans"), the Soffers and Turnberry Sub entered into pre-
19   negotiation agreements with Deutsche Bank, as agent for the Senior Lenders (the "construction loan
20   PNA" and the "mezzanine loan PNA" (collectively, the "PNAs")). Under the PNAs, the parties
21   sought to restructure a new loan. In November 2009, the mezzanine loan PNA was amended to
22   include FMC II Pooling and its affiliates as "negotiating parties".

23   　　In March 2009, the Soffers commenced negotiations with the Senior Lenders to restructure
24   the loans. The parties planned a "friendly foreclosure" to facilitate a global restructuring of the
25   construction loan, which would wipe out the mezzanine loan.

26   　　The Soffers, not wanting the mezzanine lenders to be wiped out, reached out to Glasgow in
27   the summer of 2009. The Soffers proposed a joint venture whereby the Soffers, TBC, and FMC

28

James C. Mahan
U.S. District Judge

would form a new borrower to take the new loan from the Senior Lenders in exchange for retiring the mezzanine loan. Plaintiffs allege that the FMC managers feigned interest in the joint venture in order to steal Town Square from the Soffers.

In November 2009, FMC LLC and FMC II Town Square entered into a written limited liability company agreement (the "joint venture agreement") with TBC. The signature pages were held in escrow until the new loan was complete. Plaintiff alleges that FMC utilized the PNA and disclaimer language in the joint venture agreement as part of its scheme to lull the Soffers into believing that they were partners with FMC when in reality FMC intended on blocking the new loan.

In December 2009, the Bank of Nova Scotia ("BNS"), which succeeded the Deutsche Bank as administrative agent for the Senior Lenders, nearly reached a final deal for the new loan, identifying  material terms and parties to the contract.

In August 2010, plaintiffs allege that defendants began their plan to block the closing of the new loan. In September 2010, plaintiffs allege that defendant made false claims to the Senior Lenders regarding the Soffers' management of Town Square. In October 2010, plaintiffs allege that defendants stopped communicating with the Soffers.

In February 2011, defendants, along with other hedge funds, purchased a significant portion of the senior debt from the Senior Lenders. Collectively, these hedge funds gained control of the Senior Lenders and blocked the restructuring with the Soffers. In March 2011, FMC II Pooling bought Town Center at a non-judicial foreclosure for $276,500,000.

Plaintiffs allege that this was all part of defendants' plan: to lull the Soffers into believing that they were partners with defendants, in order to stop the senior lenders from executing the "friendly foreclosure," thereby wiping out the mezzanine loan.

Plaintiffs filed an amended complaint claiming that defendants (1) tortiously interfered with a contract or prospective economic relationship, (2) made fraudulent representations, and (3) breached fiduciary duties. (Doc. #8). Subsequently, defendants filed a motion to dismiss all claims made by plaintiffs (doc. #27), which the court partially granted, leaving plaintiffs' claim for tortious interference with a prospective contractual relationship (doc. #44). Defendants then filed the motion

James C. Mahan
U.S. District Judge

1   presently before the court, urging the court to reconsider the partial denial of the motion. (Doc. #47).

2   **II.    Legal Standard**

3          Motions for reconsideration "should not be granted, absent highly unusual circumstances."

4   *Kona Enters., Inc. v. Estate of Bishop*, 229 F.3d 877, 890 (9th Cir. 2000); See also *Ybarra v.*

5   *McDaniel*, 656 F.3d 984, 998 (9 th Cir. 2011).  "Reconsideration is appropriate if the district court

6   (1) is presented with newly discovered evidence, (2) committed clear error or the initial decision was

7   manifestly unjust, or (3) if there is an intervening change in controlling law." *School Dist. No. 1J v.*

8   *ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993); *Kona*, 229 F.3d at 889-90 (listing same three

9   factors).

10         Rule 59(e) "permits a district court to reconsider and amend a previous order," however "the

11  rule offers an extraordinary remedy, to be used sparingly in the interests of finality and conservation

12  of judicial resources." *Carroll v. Nakatani*, 342 F.3d 934, 945 (9th Cir. 2003) (internal quotations

13  omitted). "A Rule 59(e) motion may not be used to raise arguments or present evidence for the first

14  time when they could reasonably have been raised in the earlier litigation." *Id.* (citing *Kona*, 229

15  F.3d at 890).

16  **III.   Discussion**

17         Defendants do not present any newly discovered evidence or argue that there has been a

18  change in controlling law, but instead bring their motion under the second ground for

19  reconsideration: "the district court committed clear error or made an initial decision that was

20  manifestly unjust." *Ybarra*, 656 F.3d at 998; (*see* doc. #47, 7).

21         Defendants argue first that the court erred in its choice of law analysis. They suggest (a) that

22  there is contradiction between New York and Nevada law under the tort of intentional interference,

23  (b) that New York law should control, and © that under New York law, plaintiffs have failed to state

24  a claim under which relief may be granted.

25         In the alternative, defendants argue that the court erred in its application of Nevada law,

26  suggesting that the question of motive in intentional interference torts is not settled under Nevada

27  law, and the court should therefore look to California law as persuasive authority. They argue that

28

**James C. Mahan**
**U.S. District Judge**                                        - 4 -

1   Nevada's jurisprudence on the tort of intentional interference with prospective economic

2   relationships has developed in tandem with California's law on the subject.

3       **A.    The court did not err its application of Nevada law**

4       To prove intentional interference with a prospective contractual relationship under Nevada

5   law, a plaintiff must establish: "(1) a prospective contractual relationship between the plaintiff and

6   a third party; (2) knowledge by the defendant of the prospective relationship; (3) intent to harm the

7   plaintiff by preventing the relationship; (4) the absence of privilege or justification by the defendant;

8   and (5) actual harm to the plaintiff as a result of the defendant's conduct." *Wichinsky v. Mosa*, 109

9   Nev. 84, 85-88 (1993).

10      The dispute of law here revolves around the fourth factor: the absence of privilege or

11  justification. In Nevada, "[p]rivilege can exist when the defendant acts to protect his own interest."

12  *Leavitt v. Leisure Sports Incorporation*, 103 Nev. 81, 88 (1987). Defendants suggest that as long as

13  their motivation is at least partially driven by economic interests, then their conduct is privileged.

14  (*See* doc. #47, 12-15). However, the justification of privilege was qualified by a later Nevada

15  decision, in which the court declared: "we favor the Restatement view that where the interference

16  is improper it is not privileged." *Las Vegas-Tonopah-Reno Stage Line, Inc. v. Gray Line Tours of*

17  *S. Nevada*, 792 P.2d 386, n.5 (1990).

18      Defendants misunderstand or mischaracterize the nature of the court's order. In its analysis

19  of the fourth factor in the test for tortious interference under Nevada law, the court finds that

20  "plaintiffs have alleged sufficient factual matter to demonstrate the defendants used improper means

21  to interfere with plaintiff's prospective contractual relationship." (Doc. #44, 11); *see Iqbal,* 129 S.Ct.

22  at 1949. Under the *Gray Line* decision, interference that is improper may not be privileged. *See* 792

23  P.2d 386 at n.5. If the alleged conduct may not be privileged, then plaintiffs have established "the

24  absence of privilege or justification by the defendant" and successfully pled a plausible claim for

25  relief. *Wichinsky*, 847 P.2d at 729-30; *see Iqbal,* 129 S.Ct. at 1949.

26      The fact that the court dismissed plaintiffs' fraud claims and breach of duty claims does not

27  mean that the factual allegations underlying those claims will be disregarded in the analysis of

28

**James C. Mahan**
**U.S. District Judge**

- 5 -

alternative causes of action. *See Iqbal,* 129 S.Ct. at 1949. Instead, the court must accept as true all well-pled factual allegations in the complaint. *See id.* The court dismissed the fraud claims not because they were pled unsuccessfully, but because of the parol evidence rule applied to the PNA. (*See* doc. #44, 13-15). The parol evidence rule does not apply to improper interference though. *See, e.g.*, *Wichinsky*, 847 P.2d at 729-30.

The factual assertions behind plaintiffs' claims of fraud constitute allegations of improper, unlawful conduct. In fact, paragraph 106 of plaintiffs' amended complaint specifically alleges the use of "improper means, including misrepresentations and fraudulent concealment." (Doc. #8, ¶ 106). Other sections of the amended complaint make more specific allegations, describing conduct that the court found adequate for a knowing misrepresentation claim. (*See* doc. #8, ¶¶ 29, 35, 36-37, 39-40; doc. #44, 12).

The plaintiffs successfully allege that improper means were used to obstruct their prospective contractual relationship with the Senior Leaders. (*See* doc. #8, ¶¶ 29, 35, 36-37, 39-40, 106; doc. #44, 11). Looking at the face of plaintiffs' amended complaint, plaintiffs make factual allegations that defendants engaged tortious tactics in their efforts to sabotage the loan restructuring between the Soffers and the Senior Lenders. (*See* doc. #8, ¶¶ 29, 35, 36-37, 39-40). This was and is sufficient to state a plausible claim for relief for improper interference under Nevada law. *See Gray Line*, 792 P.2d 386 at n.5; *Leavitt*, 103 Nev. at 88.

**B.    The court did not err on choice of law**

Under the interference doctrine, the laws of California and Nevada both impose liability for wrongful or improper conduct that interferes with a prospective contractual relationship.[1] *See Gray Line*, 792 P.2d 386 at n.5; *Carvel Corp v. Noonan*, 818 N.Y.2d 1100, 1104 (2004). In a footnote of the order under reconsideration, the court noted that there is conflict between jurisdictions on the state of mind of the defendant that plaintiff is required to prove where there is a finding that

---

[1] The order features the 'improper means' language. The phrase 'improper means' is Nevada law's analog to New York law's 'wrongful means.' Functionally, they are interchangeable. Finding that the outcome would be the same under both state's laws, the court applied the forum state's law for the sake of simplicity. The choice of law question is preserved. (*See* doc. #44, 7, n.4).

1   defendant's conduct is *lawful*. (*See* doc. #44, 11, n.5).  Defendants focus on the fact that the court

2   indicated it would apply the law of the forum state on this issue. (*See* doc. #47, 7). The court's

3   holding, though, was based not on this issue of motives, but instead on plaintiffs' allegations that

4   defendants employed improper, unlawful means to obstruct the new loan agreement between the

5   Soffers and the Senior Lenders. (*See* doc. #44, 11).

6        Defendants argue that under New York law, their conduct is privileged because it is at least

7   partially motivated by an economic interest. *See Carvel*, 818 N.Y.2d at 1104. That is, the conduct

8   was not motivated purely by the desire to harm the plaintiff, but at least partially by self-interest. *See*

9   *id.* In focusing on this rule, defendants overlook the fact that plaintiffs have made allegations of the

10  use of improper or wrongful means by the defendants. (*See* doc. #8, ¶ 106). This is sufficient under

11  the alleged state of mind.

12       On the question of whether improper or wrongful means may be considered privileged,

13  Nevada and New York law are in accord that the answer is no. *See Gray Line*, 792 P.2d 386 at n.5;

14  *Carvel*, 818 N.Y.2d at 1104. As discussed above, improper interference is not privileged under

15  Nevada law. *See Gray Line*, 792 P.2d 386 at n.5. In New York, the elements of the tort, while

16  identical to those of Nevada in practice, take a slightly different form. The third element requires

17  "the defendant [to] act[] with the sole purpose of harming the plaintiff *or* us[e] wrongful means."

18  *Advanced Global Tech. LLC v. Sirius Satellite Radio, Inc.*, 836 N.Y.2d 807, 809-10 (N.Y. Sup. Ct.

19  2007) (emphasis added) (citing *Carvel*, 818 N.Y.2d at 1104).

20       New York courts interpret the phrase "wrongful means" to include fraud and

21  misrepresentation, just as Nevada courts interpret the phrase "improper means" to include fraud and

22  misrepresentation. *See Carvel*, 818 N.Y.2d at 1104. So while Nevada may use the word "improper"

23  and New York may use the word "wrongful", the law of both states imposes liability on defendants

24  who have interfered with a prospective economic relationship through unlawful means, including

25  fraud and misrepresentation. *See Gray Line*, 792 P.2d 386 at n.5; *Carvel*, 818 N.Y.2d at 1104.

26       Defendants' argument mistakenly assumes that the court focused on the "sole purpose"

27  language from New York's third element, for which the inquiry is focused on the defendant's state

28

**James C. Mahan**
**U.S. District Judge**

of mind. (*See* doc. #47, 9-11). Really, the court's decision to deny the motion was based on the "wrongful means" language. (*See* doc. #44, 11:7-9).[2] Plaintiffs have alleged the use of fraudulent misrepresentations to interfere with a prospective contract. (*See* doc. # 8, ¶ 106). This conduct is either "improper" or "wrongful", as the words are used in the jurisprudence of Nevada and New York, respectively. *See Gray Line*, 792 P.2d 386 at n.5; *Carvel*, 818 N.Y.2d at 1104.

Because plaintiffs have alleged wrongful or improper conduct by the defendants, they have successfully pled a plausible claim for relief under both Nevada and New York law. *See Iqbal*, 129 S.Ct. at 1949; *Twombly*, 550 U.S. at 555; *Gray Line*, 792 P.2d 386 at n.5; *Carvel*, 818 N.Y.2d at 1104. Therefore, it was unnecessary for the court to decide the choice of law question at this stage in the proceedings. Whether the court applied Nevada or New York law, the outcome would have been the same. That being the case, the choice of law issue is preserved. (*See* doc. #44, 7, n.4).

Defendants argue that Nevada should follow the law of California. (*See* doc. #47, 9-10). Once again, this argument assumes that the court's decision was based on defendants' malicious state of mind. In reality, the court found that plaintiffs had alleged improper means of interference by defendants so it did not need to address defendants' state of mind. It is clear under both Nevada and New York law that improper conduct may not be privileged. *See Gray Line*, 792 P.2d 386 at n.5; *Carvel*, 818 N.Y.2d at 1104. There was no need for the court to look at California cases to resolve that issue.

**IV.    Conclusion**

Based on the discussion above, the court has determined that it did not commit clear error in either its application of Nevada law or its choice of law analysis. Therefore, defendants' motion to reconsider under Fed. R. Civ. P. 59(e) will be denied and the original order (doc. #44) will stand as entered.

. . .

. . .

. . .

_____

[2] *See supra* note 1.

**James C. Mahan**
**U.S. District Judge**

1    IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that defendants Five Mile

2  Capital Partners, LLC; Five Mile Capital II Pooling International, LLC; Five Mile Capital II Town

3  Square SPE, LLC; James G. Glasgow, Jr., and David J. Lattimer's motion for reconsideration (doc.

4  #47) be, and the same hereby is, DENIED.

5    DATED June 6, 2013.

6

7    _____

8    UNITED STATES DISTRICT JUDGE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**James C. Mahan**
**U.S. District Judge**