MORRIS LAW GROUP
Steve Morris, Bar No. 1543
Email: sm@morrislawgroup.com
Rosa Solis-Rainey, Bar No. 7921
Email: rsr@morrislawgroup.com
900 Bank of America Plaza
300 South Fourth Street
Las Vegas, NV 89101
Telephone: (702) 474-9400
Facsimile: (702) 474-9422

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| JEFFREY SOFFER, an individual; JACQUELYN SOFFER, an individual; TURNBERRY CAPITAL, LLC, a Florida limited liability company, J & JS TOWN SQUARE, LLC, a Delaware limited liability company, and TURNBERRY TOWN SQUARE, LLC, a Delaware limited liability company, <br><br> Plaintiffs, <br><br> v. <br><br> FIVE MILE CAPITAL PARTNERS, LLC, a Delaware limited liability company; FIVE MILE II POOLING INTERNATIONAL, LLC, a Delaware limited liability company; et al., <br><br> Defendants. | Case No. 2:12-cv-01407-JCM-GWF <br><br> **PLAINTIFFS' MOTION TO COMPEL AND TO EXTEND DISCOVERY DEADLINE TO COMPLETE DISCOVERY** <br><br> **(SECOND REQUEST)** |

Plaintiffs Jeffrey Soffer, Jacquelyn Soffer, Turnberry Capital, LLC, J & JS Town Square, LLC, and Turnberry Town Square, LLC (collectively, "Plaintiffs") respectfully move this Court for an order compelling Defendants Five Mile Capital Partners, LLC., et al. (collectively,

"Defendants"), to fully respond to Plaintiffs' discovery requests. As demonstrated below, Defendants have refused to collect, review and produce responsive documents beyond their unilaterally-selected cut-off date of March 4, 2011, or nearly 17 months before Plaintiffs sued. Defendants cannot meet their high burden for such an extraordinary departure from the discovery protocols in the Federal Rules of Civil Procedure.

Plaintiffs request that the Court order defendants to fully respond to each discovery request addressed below within ten (10) days from the date of order. Since the additional discovery is likely to require follow-up discovery, Plaintiffs request an extension of no more than 90 days to the fact discovery deadline to complete any necessary follow-up.

As required by Fed. R. Civ. P 37 and Local Rule 26-7, Plaintiffs have conferred with Defendants to resolve this dispute without the Court's intervention. However, Plaintiffs' efforts were unsuccessful.

This Motion is based upon the papers on file, the Memorandum of Points and Authorities below, the Declaration of Christopher Major attached hereto as Exhibit A, any exhibits attached thereto, and any oral argument allowed by the Court regarding this Motion.

**PLAINTIFFS' MEMORANDUM OF LAW AND AUTHORITIES IN SUPPORT OF MOTION TO COMPEL DEFENDANTS TO FULLY RESPOND TO PLAINTIFFS' DISCOVERY REQUESTS**

**I. INTRODUCTION**

Plaintiffs seek an order to compel Defendants to fully respond to the discovery requests propounded upon them on January 18, 2003. Defendants' responses were due on February 18, 2013, and in accord with an agreed-upon extension, Defendants responded on March 7, 2013. Plaintiffs' requests sought to obtain documents needed to support the

2

claims and challenge the defenses asserted in this action. Defendants responded to the requests, but did so only for the truncated period they unilaterally selected, namely December 1, 2008 through March 4, 2011 (or, nearly 17 months before Plaintiffs filed this action). Defendants contend that any document created after March 4, 2011 is irrelevant, and have refused to budge from this untenable position. Notably, Defendants have not cited any undue burden they would allegedly suffer from following the normal protocols of producing responsive documents through the date of production. Major Decl. ¶¶ 8-10. Indeed, the Federal Rules of Civil Procedure impose upon the parties the continuing duty to supplement their discovery responses as new information is created or comes to light. *See* Fed. R. Civ. P. 26(e)(1).

Plaintiffs made an effort to confer with Defendants' counsel regarding Defendants' deficient production, but Defendants rejected Plaintiffs' offers to compromise and no acceptable resolution could be reached. Plaintiffs respectfully ask this Court compel Defendants to supplement their document production to include responsive documents at least through the date Plaintiffs filed this action.

## II. SUMMARY OF RELEVANT FACTS

In this action, Plaintiffs seek to recover the damages Defendants caused when they tortiously interfered with Plaintiffs' prospective restructured loan for Town Square Las Vegas, Plaintiffs' award winning lifestyle center just south of the Strip in Las Vegas. The syndicate of lenders agreed to make a new loan to Plaintiffs to replace the original construction loan for Town Square, but it was wrongfully blocked by Defendants.

3

Town Square first opened for business in November 2007 and was designed and developed by the Soffers, and was continuously owned and operated by the Soffers and/or their affiliates from its inception until March 2011. Am. Compl., ¶ 15. To fund construction of Town Square, Turnberry Sub obtained a $470,000,000 construction loan from a syndicate of fifteen (15) lenders (the "Senior Lending Group"). In addition to this loan, Turnberry Sub's parent, Turnberry Quad, in 2006 entered into a Mezzanine Loan and Security Agreement with Deutsche Bank as agent and initial lender (the "Mezzanine Loan Agreement"). The Mezzanine Loan Agreement provided for a loan to fund additional project costs up to $45,000,000, then increased to $50,000,000 (the "Mezzanine Loan"). The Mezzanine Loan had a maturity date of March 1, 2008, which could be (and ultimately was) extended until March 1, 2009. Am. Compl., ¶ 19.

Defendant Five Mile Capital Partners LLC ("FMC LLC") is an alternative investment fund (i.e., a hedge fund), organized as a Delaware limited liability company and is headquartered in Stamford, Connecticut. In 2007, Defendant FMC II Pooling, a Five Mile affiliate, purchased a $20,000,000 participation interest in the Mezzanine Loan from Deutsche Bank. Am. Compl., ¶ 20.

The Construction Loan and the Mezzanine Loan were meant to be short term loans to be replaced by permanent financing. Therefore, in January 2007, Turnberry Sub and its parent company negotiated with several potential lenders for "take out" permanent financing to replace the Construction Loan and Mezzanine Loan, including with Lehman Brothers. Am. Compl., ¶ 21. Because the permanent financing commitment was lost at the height of the debt crisis, the Senior Lending Group and the Soffers realized it would not be possible to obtain an alternate permanent

4

mortgage in that environment. Therefore the Senior Lending Group initiated negotiations with the Soffers about an extension of the Construction Loan, or some other sort of new loan from them or loan restructuring, that would bridge the parties to a future time period when the credit markets were functioning. Am. Compl., ¶ 24.

The Senior Lending Group proposed the restructuring to the Soffers, and the Soffers invited Five Mile to join in a joint venture with it to own the Property subject to the restructured senior loan and to pay off Deutsche Bank's $30 million piece of the Mezzanine Loan at a discount. Am. Compl., ¶ 35. Defendants Glasgow and Lattimer are Managing Directors of Five Mile. Amended Compl., ¶¶ 9-10. After rejecting Jeffrey Soffer's initial proposal, realizing the fragility of their subordinate lending position and the tremendous value and upside of Town Square, Glasgow and Lattimer of Five Mile began scheming to steal Town Square. The first step was to convince the Soffers that they were genuinely interested in forming a joint venture, when in reality, unbeknownst to the Soffers, Five Mile really wanted to oust the Soffers. Am. Compl., ¶ 36.

Five Mile ostensibly agreed to enter into the joint venture with the Soffers. Am. Compl., ¶ 37. From this point forward, Soffer and Five Mile acted as partners (or so the Soffers thought) and intended (or at least so the Soffers were told) to memorialize their partnership by entering into a written joint venture agreement. Am. Compl., ¶ 39. Glasgow and Lattimer traveled to Las Vegas on multiple occasions to meet with the Soffers and tour Town Square. During these meetings in Las Vegas, Glasgow and Lattimer falsely represented to the Soffers they were acting as partners with the Soffers, and they unlawfully concealed their true intentions to steal Town Square from the Soffers, in order to lull the Soffers into the

5

putative joint venture and thereby obtain valuable operational and leasing intelligence about Town Square from the Soffers. Am. Compl., ¶ 40.

Five Mile thereafter represented to the Soffers they were partners, and Five Mile ostensibly worked as partners with the Soffers in connection with new tenancies and business plans for Town Square, all the while receiving detailed proprietary business and leasing plans from the Soffers, who provided the information in reasonable reliance on Five Mile's representations they were partners. Am. Compl., ¶ 42.

Plaintiffs moved forward with efforts in furtherance of the partnership with Five Mile, and continued efforts to negotiate the restructuring the original loans, not knowing of Five Mile's surreptitious and nefarious scheme to lull the Soffers into believing they were partners with Five Mile when in reality Five Mile always intended on eventually blocking the restructuring of the senior loan by the Soffers and stealing Town Square. Am. Compl., ¶ 47. Five Mile wrongfully prevented the satisfaction of the escrow conditions and thus thereby prevented the technical formation of the joint venture.

The Senior Lending Group agreed to make the New Loan in the approximate amount of $448,000,000 to an entity established by the Soffers and Five Mile that would replace Turnberry Sub as the owner of the Property. The new entity would acquire Town Square by bidding at a foreclosure auction using the New Loan to finance its payment of the auction purchase price. All of the material terms of the New Loan were in writing. Am. Compl., ¶ 54.

The Soffers and Five Mile each "accepted" the offer for the new loan on December 28, 2009. Am. Compl., ¶ 55. From this point forward, Soffer, Five Mile (ostensibly) and BNS proceeded to affect the closing of the New

6

Loan. Am. Compl., ¶ 57. The parties agreed they would implement the restructuring agreement through a consensual senior loan (mortgage) foreclosure. Am. Compl., ¶ 58. The consensual senior loan foreclosure was to work as follows: A new entity controlled by the Soffers and Five Mile would bid for the Property at the foreclosure sale. If the new Soffer entity was the successful bidder at the foreclosure, it would pay the bid price with the proceeds of the New Loan, and the Original Loan would be satisfied from those proceeds (and the Soffers' fresh capital contribution). Am. Compl., ¶ 59.

In or around August 2010, Glasgow, Lattimer, and Five Mile began to actively carry out their plan to thwart the New Loan and oust the Soffers from Town Square, including by slowing down the documentation process through unreasonable negotiating positions that were designed to block the closing. Am. Compl., ¶ 63. By September 23, 2010, Five Mile began making false claims regarding the Soffers' integrity and management of Town Square. Am. Compl., ¶ 64. While the Soffers were ready to close and continued to work toward closing the New Loan, Five Mile stopped communicating with the Soffers in October 2010.

The Soffers advised BNS of this issue, at which time BNS advised the Soffers that Glasgow and Lattimer had been making derogatory and defamatory comments about them to the Senior Lending Group. ¶ 65. Five Mile also disingenuously and falsely complained about the leasing performance at Town Square. In connection with Five Mile's making a low ball bid to obtain Town Square without the Soffers, Lattimer asserted in an email that "Property tenancy and operations have deteriorated considerably in the past several months . . ." Am. Compl., ¶ 67. In fact, the leasing performance was strong under the circumstances, and increased

7

occupancy was directly linked to closing the New Loan because only then could Turnberry Development LLC ("Turnberry Development"), the property manager controlled by the Soffers, access tenant improvement reserves to finalize the leases the Soffers were negotiating.

The Soffers, as partners with Five Mile, kept Five Mile apprised of the leasing progress and all leasing opportunities. It is no coincidence that after Five Mile induced the Senior Lending Group to renege on the Commitment, and then with its companion hedge funds gained control of Town Square, tenants identified and primed by the Soffers and Turnberry Development signed leases at Town Square. Am. Compl., ¶ 68.

In addition to drafting closing documents and completing closing checklist items outlined above, Turnberry prepared for closing the New Loan by soliciting, at BNS's request, tenant estoppels and Subordination, Non-Disturbance and Attornment ("SNDA") agreements from the tenants of Town Square. As of October 7, 2010, Turnberry had obtained approximately 85 estoppels and 80 SNDA's out of a total 113 tenants. The requisite number of estoppels was eighty-five percent of the tenants. However, the Senior Lending Group breached the Commitment at Five Mile's insistence before this process could be completed. Am. Compl., ¶ 69. To close the New Loan, the Soffers also worked aggressively at the instruction of the Senior Lending Group to resolve and clear mechanic's liens against the Property. Am. Compl., ¶ 70.

Meanwhile, Five Mile surreptitiously continued working to steal the Property. For example, on October 26, 2010, Glasgow wrote in an email to Lattimer, "[o]n the Town [S]quare Guaranty let's put together a list of property mgr's that are acceptable to us that we can use to replace the Soffers and keep them on the Hook on the Guaranty." Am. Compl., ¶ 72.

8

Lattimer responded in part on October 27, 2010 as follows: "[d]o you think we can engineer a deal where we pay off the seniors at $350 mm (about 80 cents) and get a new loan of 70% ($245 mm) at 6.5% fixed and co-invest the $105 mm (we could bring in a great operator for 10-20% of this)." Am. Compl., ¶ 73. On or about October 23, 2010, Five Mile advised BNS (but not the Soffers) it would no longer close the New Loan as a joint venture partner with the Soffers. Instead, Five Mile announced to BNS that Five Mile would submit a new proposal to purchase the Original Loan (at a steep discount) excluding the Soffers. Am. Compl., ¶ 74. On or about November 18, 2010, David Lattimer of Five Mile made a unilateral proposal to buy the Original Senior Loan from the Senior Lending Group for approximately $350,000,000. Am. Compl., ¶ 75.

When Five Mile's direct offers to BNS were rebuffed, Five Mile ratcheted up its efforts to steal Town Square by buying into the Senior Lending Group's debt to block them from entering into the restructured loan with the Soffers. Am. Compl., ¶ 86. On February 9, 2011, Chip Kruger of Five Mile wrote an internal email confirming Five Mile's intentions to stop any restructuring with Turnberry: "Should we try to work it to 200 so we can block anything." Glasgow responded: "I think we should buy a big Block and then continue to buy until we get to $200MM." That is exactly what Five Mile proceeded to do. Am. Compl., ¶ 90.

In February 2011, Five Mile purchased $117,363,906.10 of the Senior Debt from the Senior Lending Group. Five Mile's purchases combined with the purchases by two other vulturesque hedge funds, Oak Tree Capital and CenterBridge Partners, meant that the hedge funds controlled over two hundred million of the debt, such that the hedge funds could vote to block a restructuring with the Soffers. Am. Compl., ¶ 91.

9

It was only after the debt traded in February 2011 that BNS finally advised the Soffers it would not close the New Loan. BNS, now acting as agent for Five Mile, did an about-face and stated that the Senior Lending Group would not close the New Loan and instead would take steps to quickly foreclose on the mortgage (non-consensually) and take title to Town Square through foreclosure. Specifically, Steve Kerr of BNS stated to Jacquelyn Soffer that the hedge funds do not want to be lenders, they want to own the Property, and therefore BNS would not close the New Loan. Am. Compl., ¶ 94.

As Sumitomo Mitsui Banking Corp., a member of the Senior Lending Group, noted in an internal report, "[t]he restructuring never took place due to recent sales in the secondary market by lenders that deprived the agent of the 66 2/3% of lenders needed to accept the Sponsors' proposal." In an internal email dated February 24, 2011, George Neuman of Sumitomo wrote:

> We (as a bank group) had not considered foreclosing and selling the property in the past. We had always worked towards a consensual deal with the Soffers. Going into the meeting last Thursday we all, including the agent, thought there was a consensual deal on the table. Only once it became know[n] that loans had traded did it become apparent that the agent did not have the majority required to approve a consensual deal.

Am. Compl., ¶ 96. On March 4, 2011, the Trustee conducted the non-judicial foreclosure sale and sold the Property to the Senior Lending Group's assignee, TSLV LLC, a limited liability company formed and owned by the Senior Lending Group, including (now Five Mile affiliate FMC II Pooling), for a credit bid of merely $276,500,000.00. Am. Compl., ¶ 100. Five Mile ultimately gained control of the property and closed on several of the lucrative leasing transactions that the Soffers generated and

10

disclosed to Five Mile as their partner. Five Mile's communications regarding the Town Square project, both before or after their purported "partnership" with plaintiffs are relevant to plaintiffs' claim that but for Defendants' tortious inference, Plaintiffs would have closed on the restructuring and retained ownership and control of Town Square. Major Decl. ¶ 5.

### III. LEGAL STANDARD

Plaintiffs' have made a good faith effort to resolve this discovery dispute as required by Fed. R. Civ. P. and Local Rule 26-7, before burdening the court with any discovery disputes. *See* Major Decl. ¶¶ 7-17; *see Shuffle Master, Inc. v. Progressive Games, Inc.*, 170 F.R.D. 166 (D. Nev. 1996) (stating that "'conferring' under Rule 37(a)(2)(B) must be a personal or telephonic consultation during which the parties engage in meaningful negotiations or otherwise provide legal support for their position." (internal citations omitted)); *see also Nevada Power Co. v. Monsanto Co.*, 151 F.R.D. 118 (D. Nev. 1993). This motion is ripe for consideration.

The requests for production of records at issue in this motion were request for documents within the scope of Rule 26. Defendants' election to unilaterally restrict the date and their failure to reconsider this deficiency appears to be a deliberate attempt to avoid their discovery obligations. The discovery sought is permissible under Rules 26 and 34 of the Federal Rules of Civil Procedure ("Fed. R. Civ. P.") and must therefore be produced. Rule 26(b) provides that:

> Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party. . . . Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence.

Fed. R. Civ. P. 26.

11

The discovery requests and responses here at issue are attached to the Declaration of Christopher Major as Exhibits 1 and 2. Except for Request No. 4, all requests are at issue for the same reason. Defendants have produced responsive documents only for the 18-month period of the erstwhile partnership between Five Mile and plaintiffs, rather than through the present date or at least the date litigation commenced on July 31, 2012.

Such limited production fails to satisfy Plaintiffs' obligations under Rule 34. Fed. R. Civ. P. 34 requires that a party respond to requests for production within 30 days. The party must produce *all responsive documents in their possession, custody, or control.* Fed. R. Civ. P. 34(a) (emphasis added). The rules do not permit a responding party to limit production to a unilaterally-selected date.

This Motion is proper pursuant to FRCP 37(a), which states, in relevant part:

> A party, upon reasonable notice to other parties and all persons affected thereby, may apply for an order compelling disclosure or discovery as follows:
>
> . . .
>
> (2) Motion.
>
> (B)   If . . . a party fails to answer an interrogatory submitted under Rule 33, or if a party, in response to a request for inspection submitted under Rule 34, fails to respond that inspection will be permitted as requested or fails to permit inspection as requested, the discovering party may move for an order compelling answer, or a designation, or an order compelling inspection in accordance with the request.
>
> (3)   Evasive or Incomplete Disclosure, Answer, or Response. For purposes of this subdivision an evasive or incomplete disclosure, answer, or response is to be treated as a failure to disclose, answer, or respond.

12

Fed. R. Civ. P. 37. Defendants have submitted incomplete and evasive responses to properly propounded discovery requests. Plaintiffs' motion should therefore be granted.

## IV.   LEGAL ARGUMENT

### A.   THE DISCOVERY SOUGHT IS RELEVANT AND MUST BE PRODUCED

After written discovery was served by both sides, the parties engaged in lengthy discussions to agree on the relevant universe of documents each side should search for and the custodians and search terms to be used by the parties in gathering their documents for production. The only issue the parties could not come to terms on was the time frame for the relevant documents.

In responding to plaintiffs' First Request for Production, Exhibit 1 to the Major Decl., defendants unilaterally limited the production of documents to the 18 month period in which Five Mile was purportedly working with plaintiffs to restructure the loan. Defendants' refusal is based on the following General Objection:

> D. Unless otherwise stated, Defendants object to the First Requests on the grounds that they are overbroad, unduly burdensome, and seek material that are neither relevant nor reasonably calculated to lead to the discovery of admissible evidence to the extent any such request seeks documents produced or created before December 1, 2008, and or after March 5, 2011.

*See* Major Decl., Ex. 2 at 2 (General Objections). Except for one request, Plaintiffs' discovery requests did not include a temporal limitation and instead sought *all* responsive documents,[1] because all responsive

---

[1] *See, e.g.,* Request No. 1: *All documents* evidencing Five Mile's purchase of any participation interest in the Mezzanine Loan. (emphasis added); Request No. 2: *All documents* concerning Five Mile's due diligence relating

13

documents regarding the loans and project at issue are relevant to the tortuous interference claim in this case, or may lead to relevant evidence. All responsive documents in defendants' possession, custody or control should have been produced, unless a privilege was asserted. Defendants did not log the documents withheld based on their unilaterally-selected cut-off date and do not assert they were withheld on the basis of privilege. Moreover, Defendants have not articulated any undue burden associated with the normal discovery protocol of producing responsive documents through the present.

Despite efforts to negotiate this point, Defendants refused to produce these documents based on their wholesale contention that *any* documents before or beyond the date they selected are irrelevant because are beyond the foreclosure date. But this is not a foreclosure case. It is a case about Defendants' interference with Plaintiffs' prospective economic advantage, in order to steal Town Square from Plaintiffs. Indeed, Defendants remain in control and ownership of Town Square today. Moreover, Defendants have participated in separate litigation against the Soffers relating to Town Square. Documents outside the 18 month period unilaterally selected by Defendants are crucial to Plaintiffs' claim.

Fed. R. Civ. P. 26(b)(1) contemplates broad discovery. The United States Supreme Court has broadly defined relevance as "any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978); *Miller v. Pancucci*, 141 F.R.D. 292, 296 (C.D.

---

to Town Square in connection with Five Mile's purchase of a participation interest in the Mezzanine Loan. (emphasis added).

14

Cal.1992) (the relevancy requirement in discovery should be construed liberally). The Ninth Circuit has explained a broad view of discovery is "based on the general principle that litigants have a right to every man's evidence, and that wide access to relevant facts serves the integrity and fairness of the judicial process by promoting the search for the truth." *Shoen v. Shoen*, 5 F.3d 1289, 1292 (9th Cir.1993) (internal quotation marks and citations omitted); *see also N.L.R.B. v. Local Union 497, Intern. Broth. of Elec. Workers, AFL-CIO*, 795 F.2d 836 (9th Cir. 1986) ("a broad discovery standard is used for relevance"(internal citations omitted)).

As the party seeking to avoid discovery, defendants bear a heavy burden of demonstrating why discovery should be denied. *Blankenship v. Hearst Corp.*, 519 F.2d 418, 429 (9th Cir.1975); *DIRECT TV, Inc. v. Trone*, 209 F.R.D. 455, 458 (C.D. Cal. 2002); *Smith v. Gorilla, Inc.*, No. CV-10-17-M-DWM-JCL, 2010 WL 4286246 (D. Mont. 2010). It is not unusual or unreasonable for district courts to allow discovery from a time period before and beyond the specific event(s) at issue in the case, because such discovery is usually likely to lead to admissible evidence. *See Burdette v. Steadfast Commons II, LLC*, No. 2:11-980-RSM, 2012 WL 3762515 (W.D. Wash. 2012) (in a slip and fall action, court allowed discovery for a 5 year period preceding the injury and a four year period after the injury); *Rogers v. Giurbino*, No. 11-CV-560-IEG (RBB), 2012 WL 6625552 (S.D. Cal. 2012) (in §1983 action against prison officer alleging violation of religious practices during lockdowns, prisoner was entitled to discovery of memoranda regarding lockdown during time period after officer's departure from the prison); *Gorilla, Inc.*, 2010 WL 4286246 (in products liability action, court declined to limit discovery to time period beginning with manufacture of model at issue and ending with date of injury and

15

ordered instead that discovery was relevant for entire 10 year period that defendant had been in business); *In re Seagate Tech. II Sec. Lit.*, No. C–89–2493 (A)–VRW , 1993 WL 293008 (N.D. Cal. 1993) (subpoenas would not be limited to narrow window of time surrounding class period where the documents sought pertain to the core issues in the case); *see In re Advanced Interventional Sys. Sec. Lit.*, No. SACV92- 723-AHS (RWRX), 1993 WL 331006 (C.D. Cal. 1993) (rejecting efforts to limit discovery to the period in which class plaintiffs purchased stock and holding plaintiffs were entitled to discovery for the entire time that defendants were planning to take the company public); *In re Control Data Corp. Sec. Lit.*, No. 3–85–1241, 1988 WL 92085 (D. Minn. 1988) (limiting discovery to the time frame of the alleged improper behavior "is too cramped a view of what is discoverable" and thus post-offering statements, conduct and documents would be discoverable on the issue of intent, regardless of time frame).

Here, the parties heavily negotiated the relevant custodians and relevant subject matter on which discovery would be had; thus the relevancy of the requests cannot be reasonably denied. All responsive documents in Defendants' "possession, custody or control" are discoverable under Rule 26 because they are relevant, or likely to lead to relevant evidence. For example, Defendants have participated in separate litigation involving Town Square, including sending its New York counsel to oral argument in a separate Nevada state court action. Moreover, Defendants are actively owning and managing Town Square. After usurping Plaintiffs' business opportunities, Five Mile closed several of the lucrative leasing transactions they Soffers generated and disclosed to Five Mile during their purported "partnership." Defendants' communications with the tenants before and after the 18-month partnership are relevant and/or likely to

16

lead to other relevant evidence about defendants' interference with plaintiff's prospective economic advantage. It is inconceivable that no relevant documents exist after March 4, 2011. Likewise, documents evidencing Five Mile's communications with the Senior Lending Group or the other hedge funds concerning Plaintiffs and the claims at issue are all relevant and likely to lead to other relevant evidence of defendants' interference with plaintiffs' economic opportunities. Defendants cannot be allowed to avoid their discovery obligation by unilaterally limiting the scope of production.

Under Rule 37, incomplete responses such as those offered by defendants must be treated as a failure to disclose, answer or respond. Fed. R. Civ. P. 37(a)(3). Plaintiffs request that the Court compel all defendants to produce all responsive documents within 10 days of the Court's order and order defendants to bear the cost of this motion.

### B. THE DISCOVERY DEADLINE SHOULD BE EXTENDED TO ALLOW FOLLOW-UP DISCOVERY ON THE DOCUMENTS DEFENDANTS REFUSED TO TIMELY PRODUCE.

Although this action was filed on August 31, 2012, it has progressed slowly due to motion practice. Defendants did not answer until May 3, 2013, after their motion to dismiss was granted in part and denied in part. Defendants thereafter moved for reconsideration of the Court's ruling on the motion to dismiss, which the Court denied on June 6, 2013. According to the scheduling order entered by the Court last December, discovery closes on September 18, 2013, and written fact discovery was originally set to close on May 17, 2013. (Doc. 41). On April 23, 2013, the Court approved the parties' request to extend written discovery from May 17 to July 16, 2013. (Doc. 53). The reasons that extension was required were set forth in the stipulation (Doc. 53) and remain true today. There is extensive

electronically stored information and the parties have been meeting in an attempt to agree on custodians, search terms, and the applicable date ranges. Major Decl. ¶ 6. As discussed above, the parties' inability to agree on a cut-off date, and Defendants' unilateral imposition of a cut-off date, are the reason this second extension is needed.

Plaintiffs timely requested the discovery at issue in this motion on January 18, 2013. Defendants have steadfastly refused to produce responsive documents beyond their selected date and if the Court requires them to fully respond, there will be insufficient time to complete follow-up written discovery likely be required after review of their production.

Discovery has continued since the April 23, 2013 stipulation,[2] and except for the discovery for the disputed dates, written discovery is expected to be completed by the July 16 deadline. The discovery that will remain after the July 16, 2013 written discovery deadline is follow-up written discovery needed after review of the production plaintiffs hopes the Court will compel as a result of this motion.

Plaintiffs respectfully ask that the Court extend the discovery deadline for a reasonable period following defendants' production of the documents. The extended discovery period should be to conduct any follow-up discovery required. Without knowing the volume of the discovery, plaintiffs cannot estimate the time needed; however, unless the additional production is extremely voluminous, no more than 90 days should be needed.

---

[2] To avoid a duplicative explanation and to the extent necessary herein, Plaintiff incorporates the explanations set forth on pages 2:12 – 4:10 of Doc. #53.

18

## V. CONCLUSION

Defendants have refused to provide full responses to the minimal discovery requests propounded by plaintiffs. Defendants' failure is inexcusable and in direct contravention of their discovery obligations. Defendants cannot unilaterally declare themselves exempt from a litigant's basic discovery obligations. Plaintiffs respectfully requests that this motion be granted and that defendants be ordered to supplement each response herein addressed within ten (10) days from the date of the order, and that Defendants bear the cost of this motion.

Plaintiffs also ask that the discovery deadline be extended for a reasonable period following production so that they have an opportunity to review the documents and conduct any necessary follow-up discovery.

MORRIS LAW GROUP

By: /s/ *signature*
Steve Morris, Bar No. 1543
Rosa Solis-Rainey, Bar No. 9108
900 Bank of America Plaza
300 South Fourth Street
Las Vegas, Nevada 89101

CARBAJAL & MCNUTT, LLP
Daniel R. McNutt, Bar No. 7815
Hector J. Carbajal II, Bar No. 6247
625 South Eighth Street
Las Vegas, Nevada 89101

MEISTER SEELIG & FEIN, LLP
Stephen B. Meister (*admitted pro hac vice*)
Christopher J. Major (*admitted pro hac vice*)
2 Grand Central Tower
140 East 45th Street, 19th Floor
New York, New York 10017

Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

Pursuant to Fed. R. Civ. P. 5(b) and Section IV of District of Nevada Electronic Filing Procedures, I certify that I am an employee of MORRIS LAW GROUP, and that the following documents were served via electronic service: **PLAINTIFFS' MOTION TO COMPEL AND TO EXTEND DISCOVERY DEADLINE TO COMPLETE DISCOVERY (SECOND REQUEST)**

TO:

James W. Bradshaw
Kristen T. Gallagher
Patricia K. Lundvall
MACDONALD CARANO WILSON
2300 W. Sahara Ave., Ste. 1200
Las Vegas, Nevada 89102

*Attorneys for Defendants*

David Fleischer
Louis Michael Solomon
HAYNES AND BOONE, LLP
30 Rockefeller Plaza
26th Floor
New York, NY 10112

*Attorneys for Defendants*

DATED this 15th day of July, 2013.

By: _____

20